IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL NO. 22-cr-33 |
| v. | : | |
| JOSEPH PAUL BERGER | : | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION
FOR RELEASE FROM CUSTODY**

The defendant's motion to vacate pretrial detention should be denied. This case arose after agents from Homeland Security Investigations discovered that the defendant possessed 13 unlicensed machine guns and 12 unlicensed firearm silencers. The arsenal that the defendant and his father amassed over more than a decade shows that he is a danger to the community, and his history of anti-government rhetoric demonstrates that he is unlikely to abide by this Court's terms of supervised release thereby making him a risk of flight. This court should therefore deny the defendant's motion for pretrial release, and he should remain detained as recommended the Honorable Pamela Carlos.

**I.    FACTS**

In support of this motion, the government submits the following representations and proposed findings of facts:

The case arose after agents from Customs and Border Patrol and Homeland Security Investigations (HSI) seized three packages containing firearm silencers that were imported from China. The packages were addressed to the defendants at their residence in Bethlehem, Pennsylvania. Agents from the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF)

1

inspected the intercepted devices and confirmed that they were firearm silencers as defined in 18 U.S.C. § 921. The silencers were therefore subject to the provisions of the National Firearms Act. The paperwork accompanying two of the silencers included a cell phone number for defendant Joseph Paul Berger.

Based on the seizure of these devices, HSI agents obtained a search warrant for the defendant's residence. During the execution of the search warrant, agents seized electronic devices, 12 firearm silencers, and 13 suspected machine guns.[1] The silencers and suspected machine guns were submitted to the ATF Forensics Laboratory where they were examined by an ATF expert. The expert concluded that each of the silencers met the legal definition of a firearm silencer and that none of them had the required registration in the National Firearms Registry. The silencers that were recovered from the defendant's home included the "solvent trap" silencer intercepted by HSI at the border, and nine "oil filter" silencers that were made from commonly available auto parts. The oil filter silencers were modified so that a bullet could be fired through them, and in some examples the ends of the silencers were already deformed as if a bullet had been fired through them.

The ATF forensics expert also concluded that each of the suspected machine guns were, in fact, machine guns and were not registered as required under the NFA. A machine gun is "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. §

---

[1] Agents also observed an additional 5 firearms of a variety of make and caliber, as well as hundreds of rounds of ammunition.   Because the defendant and his father were not at the time prohibited from possessing these additional firearms and ammunition, they are not the subject of the charges of the indictment.

2

5845(b). Here, the ATF lab expert test fired each gun and determined that it was capable of fully automatic fire. Additionally, the report notes that each machine gun either had an index mark on the receiver that indicated the fully automatic firing position, or a trigger group which included a selector that permitted the gun to be fired as a machine gun. Images below show four of the machine guns that were seized from the defendants' home.



**I.O. Industries, Inc. Casar, 7.62x39mm caliber, serial number 015218
Purchased by Joseph R. Berger**



**RomArm AES 10B, 7.62x39mm caliber, serial number VR24951976
Purchased by Joseph R. Berger**



**Century Arms C308 Sporter, .308 Winchester, serial number C308E10500
Purchased by Joseph P. Berger**



**MKE Z5P, 9mm caliber, serial number T0624-15BK02008
Purchased by Joseph P. Berger**

As part of this investigation, HSI agents confirmed that one of the defendants was the original purchaser of all the guns listed in the indictment—in total Joseph Paul Berger purchased three of the machine guns and Joseph Raymond Berger purchased ten of the machine guns. Investigators also learned from manufacturers and federal firearms licensees that the seized firearms were not originally sold as fully automatic machine guns. When the guns were examined by ATF, the expert determined that each gun was modified, after purchase, to make it capable of fully automatic fire. The modification of these guns involved milling or grinding off a portion of the firearms' receiver which were designed to prevent the weapons from being converted to machine guns. Examples of the modifications for the guns show above are detailed

here:









The defendants stockpiled the silencers and machine guns in a secured basement room. Subsequent investigation showed that the room was exclusively controlled by the defendants—it was secured by a lock and the defendants were the only people to enter and access the room. Investigation also showed that firearms parts designed specifically for machine guns were ordered from various online retailers by the defendants. For example, in August and October 2016, "Joseph R. Berger" purchased bolt assemblies for Zenith Arms firearms that were purchased by Joseph Paul Berger during those same months. The online listing for the bolt assemblies notes that "These are military production, full-auto bolt assemblies." In December of 2020—approximately one month before the search warrant was executed—defendant Joseph Paul Berger ordered additional parts for the same machine guns from a separate online retailer.

This is strong evidence that both Joseph Raymond and Joseph Paul Berger jointly possessed the machine guns that were recovered from their basement.

HSI's investigation also revealed that defendant Joseph Paul Berger has the knowledge of firearms and machining necessary to convert the weapons from semi-automatic firearms, as they were originally sold and purchased, into unregistered fully automatic machineguns. Information obtained from a computer seized during the search showed that defendant Joseph Paul Berger was a certified armorer and machinist, has experience working on firearms from his time in the military, and hosted a podcast about firearms called the "Alt-Right Armory." In that podcast, the defendant uses the moniker "GlockDoctor1488" and conducts extensive discussion of weapons such as those seized from his home. Finally, search terms from the defendants' computer show that they were seeking out devices to be used as firearms suppressors. Specifically, they searched the internet for "best solvent trap suppressor," "fuel filter suppressor," "oil filter suppressor" and "80% suppressor kits."

In sum, the facts of this case show that the defendants illegally possessed a trove of firearms suppressors and machine guns in violation of the National Firearms Act. As explained below, these weapons are exceedingly dangerous and demonstrate that the defendant presents a danger to the community.

## II.   ARGUMENT

"By moving for pretrial release, [the] [d]efendant is in essence requesting a review of" the Magistrate Judge's detention order. *United States v. Calderon*, No. 09-155-11, 2010 WL 4237967, *2 (E.D.Pa. Oct. 26, 2010). This Court has jurisdiction to review the detention order under 18 U.S.C. § 3145(b), and must make an "independent determination" of whether detention

is appropriate while also giving "the reasons articulated by the [magistrate] judge 'respectful consideration.'" *United States v. Suppa*, 799 F.2d 115, 120 (3d Cir. 1986) (quoting *United States v. Delker*, 757 F.2d 1390, 1400 (3d Cir. 1985); *accord United States v. Cole*, 715 F.Supp. 677 (E.D.Pa. 1988). Pretrial detention is appropriate when "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person in the community." 18 U.S.C. § 3142(e)(1). Here, no such conditions exist to reasonably ensure the safety of the community or assure the appearance of the defendant.

### A. The defendant is a threat to the community.

The nature and circumstances of the crime charged here shows that the defendant is a danger to the community. He amassed an arsenal of fully automatic machine guns: Eight AK-style rifles, two C308 .308 Winchester caliber rifles, two MP5k submachine guns, and one RPK-style machine gun. There can be no doubt that possession of these unregistered and "exceedingly dangerous weapons" present the most serious type of danger to the community. *United States v. One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame, Unknown Caliber Serial No. LW001804,* 822 F.3d 136, 142 (3d Cir. 2016) (hereinafter "*One Machinegun*"); *accord United States v. O'Brien,* 560 U.S. 218, 230, 130 S.Ct. 2169, 176 L.Ed.2d 979 (2010) (noting "[t]he immense danger posed by machineguns"); *United States v. Henry,* 688 F.3d 637, 640 (9th Cir. 2012) ("A modern machine gun can fire more than 1,000 rounds per minute, allowing a shooter to kill dozens of people within a matter of seconds. Short of bombs, missiles, and biochemical agents, we can conceive of few weapons that are more dangerous than machine guns.") (internal citation omitted); *United States v. Kirk,* 105 F.3d 997, 1001 (5th Cir.1997) (en banc) (per curiam) (Higginbotham, J., concurring) ("Machine guns possess a firepower that

outstrips any other kind of gun."). The Third Circuit has forcefully emphasized the inherent danger presented by machine guns. *See One Machinegun*, 822 F.3d at 142 (quoting *Haynes v. United States,* 390 U.S. 85, 87, 88 S.Ct. 722, 19 L.Ed.2d 923 (1968) (describing machine guns as "weapons used principally by persons engaged in unlawful activities"); *United States v. Jennings,* 195 F.3d 795, 799 n.4 (5th Cir.1999) (noting "machine guns ... are primarily weapons of war and have no appropriate sporting use or use for personal protection")).

The defendant jointly and constructively possessed *thirteen* of these dangerous weapons. The ATF Forensic Branch noted that each machinegun was modified from its original state so that it was capable of fully automatic fire. In other words, the defendant was able to fire multiple rounds with a single squeeze of the trigger. The Supreme Court of the United States and Third Circuit Court of Appeals have recognized the inherent danger posed by these weapons—and that danger is a direct reflection of the defendant.

Although the defendant no longer possesses these weapons, his interest in acquiring firearms was not deterred by the federal search warrant executed on the defendant's home in January 2021. Since that time, the defendant has acquired additional firearms on at least two occasions. Additionally, when Joseph Raymond Berger was arrested at his home at 3401 Lehigh Street on February 7, 2022, HSI agents recovered five more guns from inside of the house.

Agents also observed a "3D printer" belonging to Joseph Paul Berger on a table inside of the home. Plastic firearms magazines for handguns and components to manufacture firearms magazines were sitting next to the printer. As explained in more detail below, the defendant hosted a podcast called the "Alt-Right Armory" which was dedicated, in part, to discussions of firearms. In the first episode, the defendant uses the name "GlockDoctor1488" and briefly

discusses a future episode dedicated to 3D printing "ghost guns." The podcast makes clear that the defendant has a marked interest in 3D printing guns, which makes him far more dangerous. If released, the defendant could easily obtain another of these devices and resume manufacturing firearms components.

The defendant claims in his motion for release from custody that "there is no indication that the 3-D printer was ever used to print firearms components." (Def. Motion, ⁋ 18). That is not true. When the defendant and his father were arrested, agents discovered 3D printed firearms magazines on a table near the defendant's 3D printer. The defendant has, therefore, already 3D printed at least one firearm-related item, and is clearly interested in that practice.

### B. The defendant is unlikely to abide by the terms of pretrial supervision.

Although the defendant has no previous criminal history, which weighs in his favor, the evidence accrued during this investigation shows that he is unlikely to abide by any terms of pretrial release that this Court will set. In the defendant's podcast, he regularly espouses anti-government and anti-law enforcement views. For example, in the pilot episode of the Alt-Right Armory the defendant notes that a "white man with a rifle can be very dangerous to the system indeed if he has the right motivation." He then extolls the values of police murderer Eric Frein and fantasizes about the cost that could be incurred by a group of people like Frein. As the Court undoubtedly recalls, Frein, in 2014 ambushed Pennsylvania State Troopers outside of a station and murdered Cpl. Bryon Dickosn. Frein then fled and was the subject of a manhunt before being caught, prosecuted, convicted, and sentenced to death. The defendant and his cohost discuss targeting not only police, but "legislators, lobbyists, and left-wing billionaires" for assassination with explosives. They halfheartedly claim that the discussion is a "prank" and a

12

"playful thought," and they are not advocating for violence. It is clear, however, that the statements are not jokes.

To be sure, the defendant's views do not form the basis for these charges, but they provide strong evidence of his anti-government ethos. Based on these views, it is highly unlikely that the defendant will respect or abide by conditions of release set by this Court, thereby making him a danger to the community and a risk of flight. This risk is compounded because the defendant has never faced criminal charges, let alone the serious federal charges that he now faces. The defendant has also been incarcerated since February 2022, so he has experienced what prison is like. If he is released, it is reasonable to believe that he would flee to avoid being returned to custody following the resolution of this case. The only way to ensure that the community is protected and the defendant appears at trial is to detain him.

### C. **The defendant's mother's medical condition is not a compelling reason to grant him pretrial release.**

The defendant argues that pretrial release is warranted because his mother suffers from lung cancer and her condition is worsening. The government is sympathetic to Mrs. Berger's medical diagnosis. However, her doctor was unable to provide a prognosis for her condition and the defendant did not provide any corroborating medical records or explain her course of treatment.

The defendant's argument is analogous to post-sentence petitions for compassionate release, which is governed by U.S.S.G. § 1B1.13. That guidelines policy statement provides that family circumstances present an "extraordinary and compelling reason" allowing consideration for compassionate release in these circumstances:

> (i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.
>
> (ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

§ 1B1.13 app. note 1(C).

The defendant's desire to assist a parent is not sufficient to obtain the extraordinary remedy he seeks. The guideline policy statement provides that qualifying family circumstances exist where the defendant is the only available caregiver for a spouse or for minor children. In contrast, "Judges in this District have yet to find care for elderly or ill parents rises to the level of extraordinary and compelling circumstance warranting release." *United States v. Siberio-Rivera*, 2020 WL 7353367, at *1 (E.D. Pa. Dec. 15, 2020) (Pappert, J.); *United States v. Gaskin*, 2020 WL 7263185, at *4 (E.D. Pa. Dec. 9, 2020) (Pratter, J.) (the desire to care for elderly parents does not qualify as extraordinary). *See also, e.g.*, *United States v. Pepper*, 851 F. App'x 890, 891 (10th Cir. 2021) (not precedential) ("caring for aging parents is not grounds for release"); *United States v. Goldberg*, 2020 WL 1853298, at *4 (D.D.C. Apr. 13, 2020) (desire to help care for elderly parents is admirable but does not qualify under the application note); *United States v. Ingram*, 2019 WL 3162305 (S.D. Ohio July 16, 2019) ( "Many, if not all inmates, have aging and sick parents. Such circumstance is not extraordinary."); *United States v. Henry*, 2020 WL 3791849, at *4 (E.D.N.Y. July 6, 2020) ("Care of parents is not a qualifying basis for release."); *United States v. Ingram*, 2020 WL 3183698, at *2 (D. Md. June 15, 2020) (desire to care for mother, who is nearing 60 and has risk factors, is insufficient); *United States v. Thorpe*, 2019 WL 6119214 (C.D. Ill. Nov. 18, 2019) (grandfather's ill health did not present an extraordinary

circumstance).

In any event, the defendant fails to carry his burden to show that he is the only available caregiver for his parent or brother. *See United States v. Rooks*, 2022 WL 267899, at *6 (E.D. Pa. Jan. 28, 2022) (Kenney, J.) (the defendant fails to show that he is the only available caregiver for his child; to prevail on such a claim, "a defendant typically must establish that all other potential caregivers for their minor child are incapacitated. . . . To prove incapacitation, a defendant must establish a person is 'completely disabled' or unable to 'carry on any self-care and [are] totally confined to a chair or bed.' . . . Moreover, it is not enough to show a potential caregiver is merely 'inconvenienced' by the childcare or 'somewhat sick.'") (citations omitted). *See also, e.g.*, *United States v. Ellsworth-Daway*, 2021 WL 2823081, at *2-3 (E.D. Pa. July 7, 2021) (Schmehl, J.) (desire to care for mother is not an extraordinary circumstance, and the defendant does not show that he is the only available caretaker in any event); *United States v. Hill*, 2020 WL 3037226 (W.D. Ark. June 5, 2020) (there is insufficient evidence that the defendant is the only caregiver for his ailing wife, and even if he were, service of 20 months of 84-month sentence is inadequate for sale of meth from the same home he would share with his wife); *United States v. Marshall,* 2020 WL 114437 (W.D. Ky. Jan. 9, 2020) (compassionate release sought on the basis of grandfather's declining health, but defendant is not the only available caregiver); *United States v. Crandle*, 2020 WL 2188865, at *4 (M.D. La. May 6, 2020) (failed to present evidence that he is only caregiver for ailing parents); *United States v. Cruz-Rivera*, 2020 WL 5993352, at *7 (E.D. Pa. Oct. 9, 2020) (Slomsky, J.) (the defendant does not carry his burden to show that his wife is incapacitated due to her breast cancer or diabetes, or that he would be the only available caregiver to their minor child if his wife were incapacitated); *United States v. Moore*, 2020 WL

7024245 (E.D. Pa. Nov. 30, 2020) (Kearney, J.) (the need for care of the inmate's mother is not an extraordinary circumstance where he has a younger sister and cousin otherwise capable of taking care of his mother).

In sum, the government is sympathetic to the defendant's desire to care for his mother who is apparently suffering from a serious medical condition, but that desire does not outweigh the danger to the community that he presents and the risk that he will not appear for trial. This is especially true now that the defendant has experienced prison and the discussions with the government make clear that a term of incarceration is nearly certain.

### III.   CONCLUSION

The defendant's past conduct and his current charges demonstrate that the defendant is both a danger to the community and a risk of nonappearance. No combination of pretrial release conditions of pretrial release will ensure the community's safety and assure his appearance at trial. Accordingly, the government respectfully requests that this Court deny the motion for pretrial release.

Respectfully submitted,

JENNIFER ARBITTIER WILLIAMS
United States Attorney


/s/ *Anthony J. Carissimi*
Anthony J. Carissimi
Assistant United States Attorney

**CERTIFICATE OF SERVICE**

I certify that a copy of the Government's Response to Defendant's Motion to Vacate Pretrial Detention Order, and Proposed Order was served via ECF, on the following defense counsel:

Eric Winter, Esquire
Counsel for Joseph Paul Berger


/s/ *Anthony J. Carissimi*
Anthony J. Carissimi
Assistant United States Attorney


Date:   April 14, 2022